IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DUOLINE TECHNOLOGIES, *L.P.,* | : | Civil Action No. 4:11-CV-1557 |
| | : | |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| POLYMER INSTRUMENTATION | : | |
| AND CONSULTING SERVICES, | : | |
| *Ltd., trading & doing business as* | : | |
| *Polymics, Ltd.,* | : | |
| DR. TIM HSU, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |
| POLYMER INSTRUMENTATION | : | |
| AND CONSULTING SERVICES, | : | |
| *Ltd.,* | : | |
| DR. TIM HSU, | : | |
| | : | |
| Counterclaim Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DUOLINE TECHNOLOGIES, *L.P.,* | : | |
| | : | |
| Counterclaim Defendants: | | |
| | : | |

**MEMORANDUM OPINION**

August 26, 2016

**I. BACKGROUND:**

1

## A.  Procedural History

Duoline Technologies, L.P., hereinafter "Duoline", a company that provides products and services to the oil and gas industry, filed a complaint on August 11, 2011 against Polymer Instrumentation and Consulting Services, Ltd., trading and doing business as Polymics, Ltd., hereinafter "Polymics".[1]  On October 19, 2011, Duoline filed an amended complaint which additionally named Dr. Tim Hsu hereinafter "Dr. Hsu" or  "Hsu", the President and CEO of Polymics, as a defendant.[2]

Duoline and Polymics/Hsu had a seemingly positive working relationship for several years prior to the filing of the complaint.  Polymics had been retained by Duoline to produce accessory products for Duoline's use with the manufactured articles it sells to the oil and gas industry.  The amended complaint is a three count pleading that alleges breach of contract at both Counts I and II and conversion at Count III for failure to return the molds used to make the accessory products.[3] The amended complaint asserts that after Duoline lawfully terminated its contract with Polymics and Hsu, they failed to return the molds used to make the accessory

---

[1]ECF No. 1.

[2]ECF No. 16.

[3]These terms are defined in the statement of facts section below.

products.

Polymics and Hsu filed an answer and three counterclaims to the complaint on December 5, 2011,[4] and subsequently an amended answer and amended counterclaims on June 7, 2012.[5]  The amended counterclaims also assert three counts.  Counterclaim I is a request for declaratory relief declaring that Polymics is the owner of the molds; counterclaim II is a breach of contract claim for profits that Duoline has allegedly failed to pay to Polymics; and counterclaim III is a misrepresentation claim, asserting that Duoline placed an 'exceptionally large' order for parts immediately before it terminated the business relationship – this caused Polymics to produce additional molds to fulfill this large, (and unbeknownst to Polymics and Hsu) final order.

Pending now before the Court are the parties cross motions for summary judgment.[6]  As discussed below, final judgment will be entered in favor of Duoline and against Polymics and Hsu.

## II. DISCUSSION:

## A. Undisputed Facts

---

[4]ECF No. 23.

[5]ECF No. 30.

[6]ECF Nos. 56 and 60.

In 2000, Robroy Industries, Inc. and its then wholly-owned subsidiary, Rice Engineering Corporation, began working with Performance Polymers, LLC and Dr. Hsu to develop a thermoplastic high temperature reinforced extrusion liner for use in certain oil and gas industry applications.[7]  Duoline is the successor in interest by asset transfer and name change to Rice Engineering Corporation.[8] Duoline manufacturers fiberglass liners for use in the oil and gas industry.[9] Duoline also provides accessory products including "rings" and "flares"[10] to

---

[7]ECF No. 67 at 1.

[8]ECF No. 70 at 1.

[9]*Id.* at 2.

[10]Joe Dodds, a former employee of Robroy, testified that a flare is "what you put over the end" of the liner.  ECF No. 57-1 at 22.  He went on to state:

> If you put the liner in the pipe, this is a fiberglass liner, the wall thickness depends on the diameter of the pipe.  But then they pump grout in the annular space between the inside of the pipe, the ID of the pipe and the OD of the liner.  And then at the end obviously you need some kind of a protection so that those corrosive products don't get into your coupling and don't get to the pipe.

> So what they do is once the grout is pumped in, they clean that up and they put a flare in the end.  And it's a device that fits on the end, it protects the steel pipe and it goes against the corrosion barrier ring or the CB ring.  And the CB ring, if you want to think about it, it's not really these together at 2000-footpound, which is a pretty good load in order to get compression on that CB ring so that you don't have any leaks of the fluid by.  And they just keep putting 35-foot lengths – some of them are 45-foot length.  It depends on the well and the pipe that's specified by the energy company.  And keep putting them downhole and you could go down like I said, 25,000 feet, which is about 5 miles, how far down in the ground.

> They're [the rings and flares] absolutely necessary to join at each coupling, you have to have those.  It doesn't do any good to put a liner in if you don't protect the couplings where it goes together.

connect the liners and the piping.[11]  These accessory products are used at the end of the liner to prevent corrosive fluids from escaping.[12]  The rings and flares are placed in the metal pipes to ensure a tight connection at the place where the two liners inside the pipes meet.[13]

Polymer Instrumentation and Consulting Services, Ltd. is the successor in interest, by way of merger, to Performance Polymers, LLC, and it trades and does business as Polymics, Ltd.[14] Polymics develops and manufactures polymers.[15]  Dr. Hsu is the founder of Polymics, and, as noted above, its president.[16]

In 2000, attempting its first foray into the oil and gas industry, Duoline (then Rice Engineering) approached Polymics about developing a thermoplastic high-temperature reinforced extrusion liner.[17]  On December 13, 2000, the parties entered into their first, of several, agreements as to both confidentiality and

ECF No. 57-1 at 22-23.

[11]*Id.*

[12]*Id.*  at 14.

[13]ECF No. 67 at 5.

[14]ECF No. 70 at 2.

[15]*Id.* Polymers are a large molecule comprised of many repeated subunits.  They are tough, viscoelastic glasses and semicrystalline structures.

[16]*Id.* at 3.

[17]ECF No. 67 at 2 and ECF No. 70 at 3-4.

development of the materials.[18]  The parties agree that they jointly contributed to

the development of the materials.[19]

The parties entered into several other confidentiality and development

agreements prior to the creation and execution of two agreements at issue here.[20]

In approximately August 2002, the parties began to develop rings and flares that

could be made inexpensively, yet also be compatible with Duoline's existing

liners.[21]   Polymics and Duoline collaborated on making the molds.  Specifically,

> [w]hen Polymics began making accessory products for Duoline, the
> process worked as follows: i) Duoline would provide Polymics with a
> drawing of the accessory product and the performance specifications for
> that product; ii) Polymics would create a mold that could be used to
> make the product described in Duoline's drawing and specifications; iii)
> Polymics would create a prototype product and measure it; iv) Polymics
> would provide the measurement data to Duoline for review; and v) if
> Duoline was satisfied with the measurement data, it would approve the
> mold for use in production.[22]

"Duoline provided Polymics with drawings of each accessory product that

contained Duoline's performance specifications for that product; the drawings

---

[18]ECF No. 70 at 4.  By way of further explanation, the 2000 agreement is not the subject
of either side's claims.

[19]ECF No. 67 at 3.

[20]ECF No. 67 at 4-6 and ECF No. 70 at 9-16.

[21]ECF No. 67 at 5.

[22]ECF No. 67 at 13.

were marked confidential."[23]

In October 2003, Duoline, Polymics, Hsu, and a Taiwanese company, Lih Kwang (a third-party vendor that manufactured the parts for Polymics to then sell to Duoline) entered into a confidentiality and development agreement, hereinafter "the 2003 agreement".[24]   This agreement is the first of two at issue in this case, and because the language is material to the disposition of the instant cross motions for summary judgment, I reproduce the text in its entirety here.

> By Confidentiality and Development Agreement dated June 29, 2001 (copy attached) between Robroy Industries and its wholly-owned subsidiary, Rice Engineering Corporation (RICE); together (individually and collectively referred to as "ROBROY") and Performance Polymers, LLC and its principal Dr. Tim Hsu (individually and collectively referred to as "PP, LLC") the parties memorialized their development program to develop a suitable thermoplastic high temperature reinforced extrusion liner for use in certain oil and gas industry downhole tubular applications and in line pipe, flow line and transportation line applications for the oil and gas industry.
>
> Following a series of inventions and the filing of a United States Provisional Patent Application Serial No. 60/404,573, the parties then entered into a Letter of Intent dated August 22, 2002 (copy attached) in which the rights of the parties in these inventions were set forth.
>
> The parties have expanded these developments to include manufacturing processes for the liners and additional accessory products such as flares, DL Rings, corrosion barrier rings, CBR-Less Connectors,

---

[23]ECF No. 67 at 14.

[24]ECF No. 67 at 7 and ECF No. 70 at 15.

weld shields, and the like.

The parties therefore with to expand the existing agreements as follows:

1.   It is contemplated that PP, LLC will outsource certain manufacturing rights to a company in Taiwan or elsewhere. Any such outsourcing requires the written authorization of RICE. Such authorized outsourcing, as well as the use of third party vendors, will also be conditioned on PP, LLC obtaining a written consent from such company including execution of a copy of this agreement acknowledging that they will agree to be bound by the terms of this agreement.

2.   RICE will purchase the initial tooling to make the accessory products.  After the initial tooling purchase, PP, LLC or its offshore manufacturer will purchase all replacement tooling as required by tooling wear.  RICE and PP, LLC by mutual agreement will use the product specifications and quality to determine when tooling replacement becomes necessary.

3.   PP, LLC and its offshore manufacturer shall maintain an inventory of the RICE owned tooling.  This inventory shall include all molds, mold inserts, mold bases and associated tooling that are required to make the respective parts.

4.  During the useful life of the tooling PP, LLC and its offshore manufacturer shall perform the routine maintenance on the tooling required to fabricate parts that meet the RICE specifications.

5.  PP, LLC and its offshore manufacturer shall destroy worn tooling that requires replacement.  The destruction shall be certified.

6.   RICE shall be granted exclusive use of the tooling and intellectual property that is developed to make these accessory products.

7.  PP, LLC and its offshore manufacturer shall consider material

8

information, dimensions, specifications and other information as proprietary and shall not disclose this information to any third party without expressed written permission.  In the same manner, RICE shall consider molding and process information as proprietary and shall not disclose this information to any third party without expressed written permission.

8.  The ownership and commercialization of any new processes and the development of accessory products will be controlled by the terms of the existing Confidentiality and Development Agreement and the Letter of Intent in the effect between the parties.

9.  In the event either RICE or PP, LLC terminate this Agreement or the pre-existing development and production relationship, PP, LLC agrees that the tooling acquired pursuant to this Agreement will either be destroyed or transferred to RICE or RICE's designee and in any event will not be used by PP, LLC or its offshore manufacturer to manufacture products for use in downhole tubular applications on in line pipe, flow line, and transportation line application for the oil and gas industry.  PP, LLC retains the right to use any technology developed in the future or hereinbefore in other fields of use as set forth in paragraphs 4(g) and 4(h) of the Letter of Intent dated August 22, 2002.

10.  The obligations and confidentiality as well as all the terms and conditions set forth in the attached two pre-existing Agreements between the parties are incorporated by reference and remain in full force and effect.[25]

Five years later, the parties entered into another agreement also at issue in this matter.  A September 14, 2008 agreement, hereinafter "the 2008 agreement,"

---

[25]ECF No. 16-1 at 2-4.

signed by Dr. Hsu on behalf of Polymics, and a representative of Duoline, critical

to the disposition of the instant motion is likewise reproduced verbatim:

Dear Polymics,

Duoline is interested in developing a vendor-vendee business relationship between Duoline and Vendor. In the course of our relationship, Vendor will have access to certain confidential information regarding Duoline. This letter agreement will set forth certain limitations on disclosure of such information.

1.   Confidential Information.   As used in this agreement, the "Confidential Information" of Duoline means all information concerning or related to the business, operations, financial condition or prospects of Duoline or any of its affiliates, regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form and regardless of whether such information was previously disclosed or is hereafter disclosed to Vendor, and specifically includes (a) all information regarding the officers, directors, employees, equity holders, customers, suppliers, distributors, sales representatives and licensees of Duoline and its affiliates, in each case whether past, present or prospective, (b) all inventions, discoveries, trade secrets, processes, techniques, methods, formulae, ideas and know-how of Duoline and its affiliates, (c) all financial statements, audit reports, budgets and business plans or forecasts of Duoline and its affiliates and (d) all information concerning or related to our potential business relationship. Confidential Information also includes the discussions giving rise to this agreement and the fact that there have been or will be discussions or negotiations concerning a possible business relationship between Duoline and Vendor. An "affiliate" means an entity which controls, is controlled by or is under common control with Duoline, whether through ownership of voting securities, by contract or otherwise. The foregoing notwithstanding, Confidential Information shall not include (x) information which is or becomes generally known to the public through no violation of this agreement by Vendor and (y) information which has been or hereafter is lawfully obtained by Vendor from a source other than Duoline (or any of its affiliates or their

respective officers, directors, employees, equity holders or agents) so long as, in the case of information obtained from a third party, such third party was or is not, directly or indirectly, subject to an obligation of confidentiality owed to Duoline or any of its affiliates at the time such Confidential Information was or is disclosed.

2. <u>Nondisclosure of Confidential Information</u>.  Vendor agrees that it will not, without the prior written consent of Duoline, disclose or use for its own benefit any Confidential Information.   Duoline shall retain ownership of its Confidential Information and no license or other rights in Duoline's Confidential Information is granted or implied hereby.

3.  <u>Return of Confidential Information.</u>  If the business relationship between Duoline and Vendor shall cease for any reason then Vendor shall return to Duoline all Confidential Information of Duoline which is in tangible form and which is then in Vendor's possession (or in the possession of any of its affiliates or their respective officers, directors, employees, equity holders, or agents).  No such termination will affect Vendor's obligations hereunder or those of its affiliates and representative, all of which obligations shall continue in effect.

4. <u>Protection of Employees</u>.   Vendor acknowledges that, in the course of business dealings between Duoline and Vendor, it may obtain knowledge of and access to employees of Duoline.  Vendor hereby agrees that it shall respect and shall not interfere wit Duoline's employment relationships.   Further, Vendor specifically agrees that during the course of our relationship and for a period of one (1) year thereafter, it will not, directly or indirectly, (a0 attempt to influence any employee of Duoline to discontinue his or her employment relationship with Duoline or (b) solicit, hire or seek to solicit or hire any employee of Duoline.  The provisions of this section shall survive the term or termination of this agreement.

5.  <u>Equitable Relief.</u>  Vendor acknowledges and agrees that Duoline would be irreparably damaged in the event that any of the provisions of this agreement are not performed by Vendor in accordance with their specific terms or are otherwise breached.  Accordingly, Vendor agrees

that Duoline shall be entitled to an injunction or injunctions to prevent breaches of this agreement and shall have the right to specifically enforce this agreement and the terms and provisions hereof in addition to any other remedy available at law or in equity.

6. <u>Severability</u>.  Any provision of this agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

7. <u>Term</u>.  This agreement shall continue in full force and effect for as long as Vendor is providing products or services to Duoline or its affiliates and may thereafter be terminated at any time by either party by providing written notice of such termination to the other party. Termination of this agreement shall not relieve Vendor of any obligation hereunder with respect to Confidential Information disclosed to Vendor prior to such termination and the restrictions set forth in this agreement shall remain in full force unless and until such Confidential Information ceases to be Confidential Information under Section 1 of this agreement.

8. <u>Miscellaneous</u>.  This agreement (a) may be amended, waived, or terminated only by a writing signed by each of the parties; (b) may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument; (c) contains the entire agreement of the parties with respect to the matters contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (d) shall be governed by the laws of the Commonwealth of Texas without reference to its conflicts of laws principles; and (e) shall be binding upon, and inure to the benefit of, the parties and their respective successors and permitted assigns.  The waiver by a party of any breach or violation of any provision of this agreement shall not operate or be construed a waiver of any subsequent breach or violation

hereof.[26]

On June 28, 2011, Duoline informed Polymics that it was terminating their business relationship.[27]   Prior to terminating the relationship with Polymics, Duoline was able to purchase molds from other suppliers.[28]   Because Duoline was able to contact other manufacturers to make its molds prior to terminating business with Polymics, Duoline did not lose any of its customers.[29]   Additionally, prior to terminating its business relationship with Polymics, Duoline placed a "larger-than-normal" order from Polymics "to create a stockpile of parts while Duoline developed an alternative network that could supply its rings and flares.[30]

In its termination letter to Polymics, Duoline enclosed a list of items to be returned, including the molds at issue.  Polymics refused to return the accessory product molds.[31]

The molds are currently in Taiwan in the possession of a company called

---

[26]ECF No. 16-2 at 2-4.

[27]ECF No. 67 at 22.

[28]ECF No. 67 at 22.

[29]ECF No. 67 at 24.

[30]ECF No. 70 at 57.

[31]ECF No. 70 at 59.

Advanced Polymer Materials, hereinafter "APM".[32]   APM is owned by Hsu and a man named Henry Shen.[33]

These are the detailed, material, undisputed facts at issue in this case. Although the Court has engaged in an in depth review of all of the exhibits submitted in support, this rendition of the undisputed facts makes clear that Duoline is the rightful owner of these accessory products molds.  As there remains no genuine dispute as to any material fact and the Court concludes, for the reasons set forth below, that Duoline is entitled to judgment as a matter of law, this matter can be appropriately concluded.

## B. Standard of Review:

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[34] Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.[35] The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the

---

[32]ECF No. 67 at 23 and ECF No. 70 at 59.

[33]ECF No. 70 at 41.

[34]Fed. R. Civ. P. 56(c).

[35]*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

non-moving party will bear the burden of proof at trial.[36] Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law.[37]

In  opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather its response must … set out specific facts showing a genuine issue for trial."[38] The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial."[39] Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."[40] However, the facts and all reasonable inferences therefrom must be viewed in the light most

---

[36]*Id.* at 325.

[37]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[38]Fed. R. Civ. P. 56(e)(2).

[39]*Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000).

[40]*Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

favorable to the non-moving party.[41]

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them.[42] Still, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a genuine issue of material fact to preclude summary judgment."[43]

## C. Analysis:

*1.  The three breach of contract claims.  Plaintiff Duoline's First Count: Breach of Contract (re: the 2003 agreement) against Polymics and Dr. Hsu;[44] Plaintiff Duoline's Second Count: Breach of Contract (re: the 2008 agreement) against Polymics; and Counterclaim Plaintiffs' Polymics and Dr Hsu's Second Counterclaim: Breach of Contract*

Duoline argues that both the 2003 and the 2008 contracts provide that it owns the molds, as the contract uses the phrase  "RICE owned tooling," and the word "tooling" is to be defined to include the molds at issue.  Polymics and Hsu counter that Duoline does not own the molds, but only the steel used to make the

---

[41]*P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

[42]*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).

[43]*Anderson*, 477 U.S. at 247-48.

[44]Although there is a choice of law clause in at least one of the contracts stating that Texas substantive law applies to disputes, the parties both cited to Pennsylvania law, and Duoline merely noted in a footnote that Texas law arguably applies (ECF No. 64 at 17 fn. 4). The Court therefore presumes that a choice of law challenge has been waived. Moreover, it does not appear that the application of Texas law would change the substantive outcome in any way.

molds. However, Defendants' argument is not supported by the clear, unequivocal language of the contracts, nor even Hsu's own testimony.

Dr. Hsu testified at his December 17, 2012 deposition that "[t]he definition of tooling in my mind is the cost of the tooling, which is what's contributed by RICE initially, right, so by that I meant the hardware or in the laymen's term, the steel required to make the mold."[45]   Hsu also testified that he agreed that RICE had the exclusive use to the intellectual property.[46]   Hsu further testified that "tooling includes molds," mold bases, and mold inserts.[47]   He also seemed to understand that his assertion that Duoline only owns the steel, but not the molds itself, is not in accordance with the 2003 agreement.   He testified that "if you read this aggressively, it doesn't make sense, but if you follow the spirit..."[48]

"The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties."[49]   "The intent of the parties to a written agreement is to be regarded as being embodied in the

---

[45]ECF No. 70-1 at 9.

[46]*Id.* at 9.

[47]*Id.* at 11-12.

[48]*Id.* at 12.

[49]*Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 590-91, 777 A.2d 418, 429 (2001), *see also Felte v. White*, 451 Pa. 137, 302 A.2d 347, 351 (1973).

writing itself."[50]  "When a writing is clear and unequivocal, its meaning must be determined by its contents alone."[51]

"Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties."[52]  "A contract contains an ambiguity "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.""[53]  "This question, however, is not resolved in a vacuum. Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.""[54]

"In the absence of an ambiguity, the plain meaning of the agreement will be enforced."[55]  "The meaning of an unambiguous written instrument presents a

---

[50]*Murphy*, 565 Pa. at 591, *see also Stuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982).

[51]*Murphy,* 565 Pa. at 591, *citing Felte,* 302 A.2d at 351 (*quoting East Crossroads Center Inc. v. Mellon Stuart Co.*, 416 Pa. 229, 205 A.2d 865, 866 (1965)).

[52]*Murphy*, 565 at 591, *see also  Hutchison v. Sunbeam Coal Co.*, 513 Pa. 192, 519 A.2d 385, 390 (1986).

[53]*Id.*

[54]*Murphy*, 565 Pa. at 591, *citing Madison Construc. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (Pa.1999).

[55]*Murphy*, 565 Pa. at 591, *see also Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 512 Pa. 420, 517 A.2d 910, 913 (1986).

question of law for resolution by the court."[56]

In the matter *sub judice,* the contracts are clear and unequivocal.  Duoline owns the tooling and Polymics must return it to Duoline.

Admittedly, the contracts could have been drafted more thoroughly.  The parties could have included a definition of "tooling," but did not.  Be that as it may, it is clear from the language in the 2003 agreement that tooling includes the molds at issue.   Paragraph 2 of the 2003 agreement states "RICE will purchase the initial tooling to make the accessory products."[57]   Defendants' argument that tooling is narrowly defined as the steel used to <u>make</u> the molds, but not the molds <u>once formed</u>, is not supported by the contract.  Even Dr. Hsu acknowledged in his deposition that the term "tooling" includes molds and mold inserts.[58]

Additionally, it is clear that Duoline, as successor in interest to RICE, owns the tooling.  Paragraph 3 of the 2003 agreement uses the term "RICE owned tooling."[59]  This language makes it clear and unambiguous that RICE owns the tooling.  Furthermore, paragraph 6 of the 2003 agreement states that "RICE shall

---

[56]*Murphy*, 565 Pa. at 591, *see also Community College v. Community College, Society of the Faculty*, 473 Pa. 576, 375 A.2d 1267, 1275 (1977).

[57]ECF No. 16-1 at 3.

[58]ECF No. 70-1 at 11-12.

[59]*Id.*

be granted exclusive use of the tooling and intellectual property that is developed to make these accessory products."[60]

Moreover, it is clear that as the owner of the tooling, Duoline, formerly RICE, now may to choose what is to be done with the tooling, whether it should be destroyed or returned.  Paragraph 9 of the 2003 agreement states that "In the event either RICE or PP, LLC terminate this Agreement or the pre-existing development and production relationship, PP, LLC, agrees that the tooling acquired pursuant to this Agreement will either be destroyed or transferred to RICE or RICE's designee..."

Finally, it appears that the Court has the authority to order Polymics to return the molds in accordance with the 2008 agreement between the parties. Paragraph 1 of the 2008 agreement defines confidential information in such a way that it clearly contemplates the tangible molds at issue which were invented jointly by Duoline and Polymics.  "As used in this agreement, the "Confidential Information" of Duoline means all information concerning or related to the business, operations, financial condition or prospects of Duoline or any of its affiliates, regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form and regardless of whether

---

[60]*Id.*

such information was previously disclosed or is hereafter disclosed to Vendor, and specifically includes ...(b) all inventions, discoveries, trade secrets, processes, techniques, methods, formulae, ideas and know-how of Duoline and its affiliates... Confidential Information also includes the discussions giving rise to this agreement and the fact that there have been or will be discussions or negotiations concerning a possible business relationship between Duoline and Vendor."[61]

The 2008 agreement goes on to explain what the parties had intended for the return of tangible property if the business relationship should cease.  Paragraph 3 of the agreement states that "If the business relationship between Duoline and Vendor shall cease for any reason then Vendor shall return to Duoline all Confidential Information of Duoline which is in tangible form and which is then in Vendor's possession (or in the possession of any of its affiliates or their respective officers, directors, employees, equity holders, or agents.)"[62]

The Court is also authorized to order the return of the molds at issue pursuant to paragraph 5 of the agreement between the parties which states, "Accordingly, Vendor agrees that Duoline shall be entitled to an injunction or injunctions to prevent breaches of this agreement and shall have the right to

---

[61]ECF No. 16-2 at 2.

[62]*Id.* at 3.

specifically enforce this agreement and the terms and provisions hereof in addition to any other remedy available at law or in equity."[63]

Accordingly, the Court will rule in Duoline's favor on both of its breach of contract claims. The Court will rule against Polymics and Hsu on their counterclaim that Duoline breached the 2003 agreement pertaining to them.

Polymics and Hsu assert they are owed monies as to the "profits associated with the molding and creation processes that Polymics developed and owns."[64] There is simply no contractual language in the 2003 agreement to support this contention.  In fact, payments, profits, due dates and the likes are never mentioned in this agreement.  Moreover, paragraph 6 of the 2003 agreement states "RICE shall be granted exclusive use of the tooling and intellectual property that is developed to make these accessory products."[65]  Dr. Hsu testified that RICE was to purchase the initial tooling, and that "we each contribute[d] a cost [of] the initial part."[66] There is no evidence to suggest that Polymics is entitled to the profits as to

---

[63]*Id.*

[64]ECF No. 30 at 22.

[65]ECF No. 16-1 at 3.

[66]ECF No. 70-1 at 8.

the creation of the molds.[67]

   *2. Plaintiff Duoline's Third Count: Conversion against Polymics and Dr.*
*Hsu*

   Duoline argues that Polymics is liable for conversion.  The law relating to

conversion is well established in the Commonwealth of Pennsylvania.  "A

conversion is the deprivation of another's right of property in, or use or possession

of, a chattel, or other interference therewith, without the owner's consent and

without lawful justification."[68]  "Conversion may be committed by [u]nreasonably

withholding possession from one who has the right to it."[69]

   Here, Polymics and Hsu admitted that they have refused to return the

molds.[70] The parties further agree that the molds are in Taiwan in the possession of

a company (APM) that Hsu co-owns.[71]   The molds are the property of Duoline.

The refusal to return them results in the conversion of the molds by Defendants.

---

   [67]Additionally, although not dispositive to the decision here, this is not the industry practice.  Both Joe Schwalbach, a former employee of Duoline who went on to start a competitive business in Texas, and Scott Waughtal, a former employee of Polymics, testified that in the industry the mold producer would make the steel mold at a loss with the intent that it would make a profit on the plastic parts made by the mold.  ECF No. 70-4 at 1-31, and 70-5 at 1-31.

   [68]*Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964).

   [69]*Id.* at 451-2.

   [70]ECF No. 70 at 59.

   [71]ECF No. 67 at 23 and ECF No. 70 at 59.

Accordingly, Duoline's motion for summary judgment will also be granted as to the conversion count.

   *3.   Counterclaim Plaintiffs' Polymics and Dr. Hsu's First Counterclaim: Declaratory Relief*

   The request of Polymics and Hsu that declaratory relief be granted in its favor by the Court declaring that the molds belong to them and not Duoline is rejected by the above discussion.  Declaratory relief will not be granted in Polymics and Hsu's favor.

   *4.   Counterclaim Plaintiffs' Polymics and Dr Hsu's Third Counterclaim: Misrepresentation*

   Polymics argues that by placing a large order prior to terminating the business relationship, Duoline misrepresented the continuing nature of the relationship to Polymics.  I disagree.

   In Pennsylvania, "a misrepresentation may be actionable pursuant to three theories: Intentional Misrepresentation, Negligent Misrepresentation, and Innocent Misrepresentation."[72]  Although Defendants do not assert under which theory they are proceeding, the Court presumes it must be intentional misrepresentation.  "The elements of intentional misrepresentation are as follows:(1) A representation;(2)

_____

[72]*Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999).

which is material to the transaction at hand;(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;(4) with the intent of misleading another into relying on it;(5) justifiable reliance on the misrepresentation; and,(6) the resulting injury was proximately caused by the reliance."[73]

Polymics and Hsu have provided no evidence of a misrepresentation on the part of Duoline.  Perhaps Polymics hopes that the Court infers misrepresentation by the fact that Duoline placed a "larger than normal" order for accessory products.  However, that, standing alone, is insufficient to state a claim for misrepresentation, let alone for the Court to grant summary judgment in counterclaim Plaintiffs' favor.  There is simply no evidence of any sort of false representation by Duoline as to the continuing nature of the parties business relationship.

### 5. Relief

It is clear that Polymics and Hsu must return the molds to Duoline.  Because the parties have not briefed the desired relief and an appropriate timeline within which to return the molds, I will retain jurisdiction and schedule a telephone conference call with the parties to discuss the relief due Duoline.

## III.  CONCLUSION:

---

[73]*Id.*

"Rule 56 allows the trial court to grant summary judgment if it determines from its examination of the allegations in the pleadings and any other evidential source available that no genuine issue as to a material fact remains for trial, and that the moving party is entitled to judgment as a matter of law."[74]   "The purpose of the rule is to eliminate a trial in cases where it is unnecessary and would only cause delay and expense."[75]   For all of the foregoing reasons, Duoline is entitled to judgment as a matter of law on its claims.   Therefore, its Motion for Summary Judgment will be granted in full, Polymics and Hsu's Motion for Summary Judgment will be denied in full, and final judgment will be entered in Plaintiff and counterclaim Defendant Duoline's favor.

An appropriate Order in accordance with this Memorandum will follow.


BY THE COURT:


 s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

---

[74]*Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

[75]*Id.*